# Shorman *against* The Farmers' Bank of Reading.

The debts of a decedent cease to be a lien on his real estate after five years, although, in his life time, he made a voluntary conveyance of it for the purpose of defrauding his creditors.

ERROR to the Common Pleas of *Berks* county.

Jacob Marshall, administrator of William Shorman, against The Farmers' Bank of Reading. This was an issue directed to try the rights of the parties to the proceeds of the sale by the sheriff of the real estate of John Strohecker deceased, in which the following facts appeared:

John Garber died intestate in 1819. Shorman was married to one of his daughters, and Daniel Strohecker to another. His lands were appraised, and Shorman, as attorney for Daniel and wife, accepted of a purpart. Daniel and wife conveyed said purpart to Shorman, and he gave a bond to them for their portion of the valuation money, amounting to $1903.24, dated the 6th August 1819, and payable in one year. Daniel Strohecker and wife gave a power of attorney to John Strohecker, authorizing the said John to transfer this bond to the bank in payment of a debt which he then owed to it. The transfer was made on the 14th September 1820. Suit was brought on this bond for the use of the bank. On the 9th April 1821, judgment was entered, *fi. fa.* issued, and a levy was made on land, and the same was not condemned. On the 17th April 1824, the judgment was opened, and it was ordered that the cause was to be tried on the merits. A verdict was rendered for the plaintiff for $2685.81, and judgment

[Shorman v. The Farmers' Bank of Reading.]

entered on the 10th August 1835. A suit was brought by John Strohecker against John Garber's administrator, which was tried in the Circuit Court on the 26th April 1827, and verdict rendered for the plaintiff for $7919.35, and judgment on the verdict. Afterwards the plaintiff gave a credit for $6649.10, leaving a balance for collection of $1270.25. For the collection of this a *fi. fa.* was issued, and a levy made on this same purpart, and it was condemned. It was sold on a *vend. exp.*, March 12th 1830, for $7400, and on the 26th April 1830 a deed was made by the sheriff to the purchaser.

The bank claimed the right to have its debt against Shorman paid out of the money raised by this sale, and an issue was formed between the widow of Daniel Strohecker and the bank to try its right to the money. After various trials, it was determined by the Supreme Court that the bank had no right to the money, because the assignment of the bond was not in the name of the principal, and therefore was not his act, and did not pass any interest, and that under all the circumstances it survived to his widow, to whom the money was decreed, and thus judgment was rendered against the bank. A suit was brought by Shorman's administrator against John Strohecker's administrator to April term 1837, and on the 12th April 1839 there was a verdict and judgment for the plaintiff for $968.25. On process issued on this judgment to January term 1842, lands were sold to the amount of $1172. This money was brought into court, and there remained for distribution, after payment of costs, the sum of $1085. The bank claimed this money as due from John Strohecker's estate, by virtue of his assignment of the bond of D. Strohecker on Shorman. Shorman's administrator claimed it on his judgment against John Strohecker's administrator. John Strohecker died on the 8th January 1835, having first made a voluntary conveyance of the property for the purpose of defrauding his creditors. The bank brought suit against the administrator of Strohecker on the 16th May 1842, which was still pending.

It was contended on the part of the plaintiff that the bank had lost its lien for their debt on the estate of Strohecker by the lapse of five years after his death before suit brought. The court below was of opinion that the limitation contained in the Act of 1834, under the circumstances of this case, did not bar the claim of the bank, and directed a verdict in their favour.

*Davis* and *Hoffman*, for plaintiff in error, referred to the Act of 24th February 1834, § 24, (*Purd.* 439); 6 *Watts* 32; 5 *Serg. & Rawle* 78; 16 *Serg. & Rawle* 79; 3 *Penn. Rep.* 18.

*Smith*, for defendant in error, argued that there was no laches on the part of the bank; that they were constantly persevering in their efforts to obtain their money, and they ought not now to be

deprived of it by the claim of a fraudulent vendee, because their efforts happened to be misdirected for a time. 17 *Serg. & Rawle* 285; 2 *Watts* 136; 4 *Rawle* 384; 6 *Watts* 96; 8 *Watts* 188; 9 *Watts* 237.

The opinion of the Court was delivered by

KENNEDY, J.—Several errors have been assigned in this case; but as we are of opinion that the Farmers' Bank of Reading has no claim upon the money in question, it is therefore wholly unnecessary to consider them in detail. The court below seem to have thought that the Act of 1834, which limits the liens of the debts of deceased debtors upon their real estates respectively to five years, operates only in favour of the heirs and devisees of such debtors, and not in favour of creditors, who, by their vigilance in bringing and prosecuting suits for their claims within the five years, where they are payable, or, if not payable, by filing the evidence thereof in the prothonotary's office within the same period, have preserved and continued their liens as against those creditors who have neglected to do so; and that both these classes of creditors are alike entitled to come in and be paid out of the moneys arising from a sale made of the real estate of the debtor, in such case, by virtue of judicial process. Or it may be that the court considered this case distinguishable from cases where the debtors die seised of the real estate which their creditors claim to have a lien on for the payment of their debts, and therefore not coming within the limitation of the Act of 1834.

In this case it appears that the debtor in his lifetime had made a voluntary conveyance of the estate to a son and a son-in-law, and not having, as is alleged, sufficient estate remaining to pay all his debts, the conveyance was therefore void as against his creditors; and upon this ground it seems that the estate, as conveyed, was taken in execution and sold after his death for the payment of his debts. But the policy and design of the Act of 1834, as also of the Act of 1797, its prototype, were not merely intended to limit the lien of the debts of deceased debtors on their real estates, but likewise to limit the liability of such estates to the payment of the debts of the deceased. But, supposing the limitation contained in the Act extended to the lien only, that would be sufficient to give the creditor a preference who had preserved and continued his lien, over the creditor who, from neglect to comply with the requisition of the Act, had lost his lien. This principle governs the practice of courts daily in appropriating the moneys arising from judicial sales of real estates, upon which judgments have been liens. They must be paid according to priority of lien; but if the lien of an elder judgment has become extinct for want of being kept alive as prescribed by the Act of Assembly, all junior judgments whose liens continue to exist must be paid out of the fund before it. But the circumstance of a debtor having voluntarily

conveyed his real estate away under circumstances which render it still subject to the payment of his debts generally, though not a lien upon it in any way, does not seem to be sufficient to take the case out of the operation of the limitation of the Act of 1834. In the first place, it seems to be quite as equitable and just that all the debts of such deceased debtor should immediately upon his death become liens upon the estate so conveyed, as if he had died seised of it; and if it prove insufficient to pay all, that it should be applied *pro rata.*

And this principle being settled and adopted once, it seems then in the second place to be quite as necessary and reasonable that the limitation provided by the Act of 1834 should be applied in the same manner and to the same extent, in such case, as in the case where the debtor dies seised of the estate. The court below, however, seem to have thought none but creditors could claim the money in such case as the present, and that, there being no creditors of John Strohecker, the deceased debtor, excepting the parties to this suit, if the bank had no right to receive any part of the money in question, then the surplus, after paying the judgment in favour of Shorman's administrator, would be lost, or at least remain without an owner; for the court say the heirs of the fraudulent vendor (John Strohecker) cannot claim it, nor can the fraudulent vendees claim it; and asks the question, if there be a surplus, where is it to go? This question is easily answered, and it is clear beyond all reasonable doubt that the surplus, if there be any after satisfying the debts which remain liens upon the fund, will belong to the voluntary or fraudulent vendees. Their right to the land, or the estate, before it was sold by the sheriff, was good against all the world except those creditors of their vendor, who, by their vigilance, had kept the liens of their debts, created by the death of the vendor, alive; and the money arising from the sale made of the estate, being a substitute for the estate, must of course, and in the very nature of things, after the lien debts are all paid out of it, belong to those who were otherwise the absolute owners of the estate at the time of sale. Had they paid all the debts that were liens upon it at the time of sale, and before it took place, it could not have been sold, so as to have devested them of their right to it. It would therefore be unaccountably strange, as also unjust, that they should be held to lose more money by the sale, excepting the costs which accrued by reason thereof, than they could have been required to pay in order to redeem the estate without a sale. In short, they are entitled to the surplus money after satisfying the lien debts, in the same manner and to the same extent that *bonâ fide* purchasers of an estate for a valuable consideration would be, when the estate is sold from them upon a judgment, or any other encumbrance that existed against it at the time of their purchase.

Judgment reversed, and the record remanded to the court below

that it may proceed thereon to make a final decree in respect to the distribution of the money in court, according to the principles laid down by this court.